CHARLES L. GIBBS v. DAVID W. WILLIAMS, *et al.*

1. SURFACE-WATER, *Control and Use of.* As a general rule, surface-water is within the control of the owner of any land upon which it falls or over which it flows; he may use all that comes upon his own, or decline to receive any that falls on his neighbor's land.

2. WATER-COURSE, *Example of.* In order to create the exception noticed in *Palmer v. Waddell*, 22 Kas. 352, it is not sufficient that the conformation of the surface be such that the water falling on a large tract of land naturally flows upon and over a depression at one end of that tract; there must be a necessity for the outflow over this depression in order to prevent the flooding of a considerable body of land, and there must be a distinct channel, with well-defined banks, cut through the turf and into the soil by the flowing of the water; the bed of a stream, or something which will present on casual glance to every eye the unmistakable evidences of the frequent action of running water.

*Error from Cloud District Court.*

ACTION brought by *Gibbs* against *Williams* and two others, to recover damages for the obstruction of an alleged water-course. Trial at the August Term, 1879, of the district

·court, and judgment for the defendants. *Gibbs* brings the ·case here. The opinion states the facts.

·· *F. W. Sturges*, for plaintiff in error.

*L. J. Crans*, and *C. K. Wells*, for defendants in error.

· The opinion of the court was delivered by

BREWER, J.: This was an action in which the plaintiff ·sought to recover of the defendants for obstructing a water-·course, whereby his cellar was flooded and property destroyed. The pivotal question is as to the existence of a water-course, ·or anything having so far the attributes of a water-course as to forbid interference with it by the owner of the soil. It is not pretended that there was any constant stream, any general flow of water. Indeed, it is perfectly plain that the only water flowing down this alleged water-course was the temporary accumulation of rainfalls. It was simply a passage-way for surface-water. True, there was some testimony tending to show the existence of a couple of springs, but very clearly they were not sufficient to cause running water, or start even a temporary stream. On the other hand, it is equally clear that the configuration of the ground is such that the surface-water, falling upon quite a tract of land, flows off through this passage-way. Of course, in time of heavy rains the ac-·cumulation forms a large stream of water, for according to ·some testimony the tract of land whose outflow of surface-water is along this way amounts to from one thousand to twelve hundred acres. This passage-way runs through the ·city of Concordia. Lots are laid off across it, and the obstruction complained of was in building a store on one of these lots and across this passage-way. It is described as being from three to five feet in depth, and from thirty to fifty feet in width. Across it at one time bridges were built by the city. It is called by various witnesses a ravine, a ·draw, a depression. Several testified to having run a mowing machine up its bed. Evidently grass was growing throughout

most of its extent. There was no general cut in the soil by the frequent flow of water. It was not a ravine, with sharp and distinct banks.

Now the ordinary rule concerning surface-water is settled and familiar; the lower estate owes no duty to the higher, and the owner of each may use or abandon surface-water as he pleases. "It is not one of the legal rights appertaining to land, that the water falling upon it from the clouds shall be discharged over land contiguous to it; and this is the law, no matter what the conformation of the face of the country may .be, and altogether without reference to the fact that in the natural condition of things the surface-water would escape in any given direction; the consequence is, therefore, that there is no such thing known to the law as a right to any particular flow of surface-water, *jure naturæ*. The owner of land may at his pleasure withhold the water falling on his property from passing on to that of his neighbors, and in the same manner may prevent the water falling on the land of the latter from coming upon his own. In a word, neither the right to discharge nor to receive surface-water can have any legal existence except from a grant, express or implied. The wisdom of this doctrine will be apparent to all minds on a little reflection. If the right to run in its natural channels was annexed to surface-water as a legal incident, the difficulties would be infinite indeed. Unless the land should be left idle, it would be impossible to enforce the right in its rigor; for it is obvious every house that is built and every furrow that is made in a field, is a disturbance of such right. If such a doctrine prevailed, every acclivity would be and remain a water-shed, and most low ground become reservoirs. It is certain that any other doctrine but that which the law has adopted would be altogether impracticable. The legal principle, as stated above, is fully established in the following cases: *Greatrex v. Hayward,* 8 Exch. 291; *Rawstrom v. Taylor,* 11 id. 369; *Broadbent v. Ramsbotham,* 11 id. 602; *Dickinson v. Worcester,* 7 Allen, 19; *Parks v. Newburyport,* 10

Gray, 28; *Luther v. Winnisimmet Co.,* 9 Cush. 171; *Ashley v. Woolcott,* 11 id. 192; *Shields v. Arndt,* 3 Green's Ch. 234." (*Bowlsby v. Speer,* 31 N. J. L. 352.)

This rule is both just and wise. It gives to each owner the fullest dominion over his own land, the largest liberty of improvement of that land according to the necessities of his business and the dictates of his judgment. It enables each to use and accumulate all the water falling upon his own land —a right of no small value in a state like ours. For it is a frequent thing for farmers on the upland prairies, away from streams, to throw up a little wall of earth at the lower side of their farms, and thus obtain a pool of stock-water supplied entirely from the fall of rain. But, wise or unwise, it has become a settled rule, and may not be disturbed save by legislative action. Like other general rules, it has some exceptions, and the effort was to bring this case within one of those exceptions—the one noticed by this court in the case of *Palmer v. Waddell,* 22 Kas. 352. In reference to this exception the district court charged as follows:

" 'The rule that the owner of a tract of land may obstruct the flow of surface-water across his land appears to and does have an exception, which is, where surface-water, having no definite source, is supplied from the falling rains and melting snow from a hilly region or high bluffs, and owing to the natural formation of the surface of the ground is forced to seek an outlet through a gorge or ravine, and by its flow assumes a definite or natural channel, and escapes through such channel regularly during the spring months of every year and in seasons of heavy rains; and such has always been the case so far as the memory of man runs.' The language just read is that of the supreme court of this state, and you are instructed that the word 'gorge,' as here used, means a defile between hills or mountains—that is, a narrow throat or outlet from a region of country. If therefore a man owns a piece of land upon which there is a gorge as thus defined, he has no right to dam it up so as to destroy or injure the region of country to which such gorge is an outlet. A ravine is defined by Webster to be a deep and narrow hollow, usually worn by a stream or torrent of water; a gorge; a mountain cleft. The language which I have heretofore cited to you from the opinion of the

supreme court as creating an exception to the general right of a party to obstruct the natural flow of surface-water, must be taken to mean that where the outlet to the surface-water which falls on a considerable region of country is over a tract of land owned by a person, and such water has worn a well-defined channel over the land of such person, and such land lies between hills, so that there is no other natural or reasonable outlet for such surface-water, then the person owning the said tract may not dam up such channel and flow the water back on lands situated above. But if a channel which conducts surface-water only runs through a level tract of country, where there is room for such surface-water to spread out and flow in other directions, and is not 'forced,' in the language of the supreme court, to seek an outlet through a gorge or ravine, then under such circumstances such channel may be obstructed by a person who does so for the purpose, in good faith, of the better enjoyment of his own land, and without malicious motives, and he would not under such circumstances be liable for damages which might be occasioned thereby."

Upon this instruction rests the claim of error. And that claim substantially is, that by the explanations and definitions attached to the language of this court, the conditions upon which the exception to the general rule depends were grossly exaggerated, and in fact the exception deprived of any practical application in this prairie state. Counsel says that there are no mountains in Kansas, and that under the district court's interpretation, the conditions of the exception do not here exist. The ruling of the district court was correct. The explanation of the language of this court was, in view of the facts of the case, appropriate, and well calculated to present to the jury the true nature and condition of the exception. We shall not stop to criticise every sentence, nor do we assert that some expressions might not mislead in some cases. But the instruction brings out clearly the distinction which in this case was necessary to guide to a correct conclusion. In this state, outside of a few level bottoms along the Kaw and other streams, the general configuration of the surface is rolling prairie. The elevation is not high, and the depression is not deep. These do not run in parallel lines. There is no uniformity in elevation or depression. There is a gradual slope

in one direction and another. From this very unevenness and irregularity, it often happens that the surface-water from a large tract tends and flows toward and over a single depression into the creeks and streams. In times of heavy rains a large body of water may thus flow. But this of itself does not make a water-course. The owner of land in this depression is under no legal obligations to receive this flow of water, and may fill up the depression. By so doing, the flow of water is simply spread over a larger surface, or along the next lower depression. There is no large accumulation of stagnant water; no body of tillable land is turned into a swamp and rendered unfit for agricultural purposes. The water is not forced to take this outlet. Deprived of this, it readily flows off in another. On the other hand, it sometimes happens, as in the *Palmer v. Waddell* case, that in a hilly country the melting snows and falling rains on a large tract form an accumulation of surface-water, which must flow through some defile or gorge between the hills; or, if that be closed, must remain on the tract, stagnant water, rendering valuable lands useless. In such cases, there appears a public necessity to forbid the obstruction of such channel. And if the defile may not be closed, then the torrent which of right comes through it has acquired so much of the characteristics of a natural stream as to be entitled to flow undisturbed through any distinct and well-defined channel which it may have cut through level lands to the river or lake. Now that which sustains this lower channel is not the fact that much water flows in it, but because of the impossibility of obstruction or dispersion before the stream reaches it. Suppose, for instance, a tract of a thousand acres nearly level, but with a slight incline toward one corner. Undisturbed, quite a volume of water in a heavy rain might accumulate and flow toward this corner — a much larger volume, in fact, than any which would accumulate in a hilly tract of only five hundred acres; yet in the one case it would not be just to call the passage-way across the corner a water-course, for dispersion of the water is easy and without danger of destruction of any considerable amount of land;

while in the other, as dispersion would be impossible and the accumulation must form a stream, it might be just to hold it possessed of all the essential attributes of a water-course.   In short, the only exception to the rule concerning surface-water is where necessity compels it.

Now in the case at bar the testimony discloses no such hilly country as accumulates a large volume of water and necessarily discharges it in a single stream through a gorge or defile. The general slope and incline doubtless cause a large flow of water in times of heavy rain along this depression, but the surface on either side of it is comparatively level.   If it be filled up, the flowing water will simply spread over a wider surface.   Indeed, it would seem that since the flood out of which this action arose, the city has partially if not wholly filled up this depression, and turned the flow in another direction.   There was no danger of flooding any considerable tract of land, none in fact except perhaps a small portion of the depression just above the obstruction.   No body of land would be rendered swampy, or unfit for tillage or other use. No interests of agriculture demanded that this passage-way for surface-water should be kept open.   Indeed, there was no certainty that the owners of nearly all the lands drained by this passage-way might not for farm purposes appropriate, and without much difficulty except in case of extraordinary rains, all the surface-water falling on their respective tracts.

Again, for a water-course there must be a channel, a bed to the stream, and not merely low land or a depression in the prairie over which water flows.   It matters not what the width or depth may be, a water-course implies a distinct channel, a way cut and kept open by running water, a passage whose appearance, different from that of the adjacent land, discloses to every eye on a mere casual glance the bed of a constant or frequent stream. (*Swett v. Cutts*, 50 N. H. 439; *Ashley v. Walcott*, 11 Cush. 192; *Hoyt v. City of Hudson*, 27 Wis. 664; Angell on Water-Courses, 5th ed., § 4; *Barnes v. Sabron*, 10 Nev. 218.)

"The banks of a river are those elevations of land which

confine the waters, when they rise out of the bed; and the bed is that soil so usually covered with water as to be distinguishable from the banks by the character of the soil, or vegetation, or both, produced by the common presence and action of flowing water. But neither the line of ordinary high-water mark, nor of ordinary low-water mark, nor of a middle stage of water, can be assumed as the line dividing the bed from the banks. The line is to be found by examining the bed and the banks, and ascertaining where the presence and action of water are so common and usual, and so long continued in all ordinary years, as to mark upon the soil of the bed a character distinct from that of the banks in respect to vegetation as well as in respect to the nature of the soil itself. . . . But in all cases the bed of a river is a natural object, and is to be sought for not merely by the application of any abstract rules, but as other natural objects are sought for and found, by the distinctive appearances they present; the banks being fast land on which vegetation appropriate to such land in the particular locality grows, wherever the bank is not too steep to permit such growth, and the bed being soil of a different character and having no vegetation, or only such as exists when commonly submerged in water." (*Howard v. Ingersoll*, 13 How. 427.)

It is very clear from the evidence that this depression lacked these essential features of a water-course. Along its bottom the grass grew as elsewhere; a little coarser and thicker, perhaps, but with that as the only difference. Mowing machines were run in it. The turf was not cut through and a distinct channel worn in the soil by the running water. Doubtless any one looking at it in connection with the surrounding land, and noticing its lower level, would perceive that it was a passage-way for surface-water, but one examining it disconnected from its surroundings would not instantaneously perceive that it was a water-course — that it was a channel cut and kept open by frequent flow of water.

In this respect, therefore, as in that previously noticed, this passage-way lacked the distinctive attributes of a water-course. We have given this case much examination, and are satisfied that the verdict of the jury is correct; and while as suggested, every expression in the instruction of the court

may not be strictly correct, yet it so presented to the jury the distinctions between a mere passage-way for surface-water and a water-course, that they could not have been misled.

We see, therefore, no error which justifies a reversal of the judgment, and it will be affirmed.

All the Justices concurring.